UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTO-OWNERS INSURANCE
COMPANY,

       Plaintiff,

v.

REDLAND INSURANCE COMPANY,

       Defendant.

_____/

CASE NO. 1:06-CV-352

HON. ROBERT J. JONKER

OPINION

INTRODUCTION

On June 23, 2004, David Gale fell asleep while driving an empty flatbed tractor-trailer. Gale's truck collided with a parked car driven by Emily Van Dyke, who was killed in the accident. The truck was owned by R&T Trucking of Waynesfield, Inc. (R&T) and leased under an exclusive lease to Everhart Trucking, LLC (Everhart). Auto-Owners Insurance Company (Auto-Owners) insures Everhart, and Redland Insurance Company (Redland) insures R&T.

The Estate of Emily Van Dyke sued Gale, R&T, and Everhart. Redland denied coverage and refused to provide a defense. Auto-Owners tendered a defense, settled the case for one million dollars, and obtained releases for all defendants, including Redland's insured. Auto-Owners asserts that the duty to defend and the obligation to pay the settlement properly

belonged to Redland and brings this action to recover the one million dollars plus defense costs. Auto-Owners and Redland have brought cross motions for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) (citing FED. R. CIV. P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When the Court considers cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 506 (6th Cir. 2003).

## FACTS

Everhart is a common and contract motor carrier. By 2004 Everhart ran nearly fifty tractor-trailers, some of which were owned and others of which were leased. (Everhart's Dep. 5–7, 17–18.) One of the tractor-trailers that it leased, truck #12, was a flatbed tractor-trailer owned by R&T. (*Id.*; Equipment Lease Agreement Between

Independent Contractor and Carrier.[1])  The lease for truck #12 provided for Everhart's exclusive possession, control, and use of truck #12.  (*Id.* ¶ 3.)  Gale was assigned by R&T and approved by Everhart to drive truck #12.  (Everhart's Dep. 17–18, 36–37.)

In 2004 Gale lived in Ada, Ohio, less than one mile from Everhart's terminal. R&T employed and paid Gale but Everhart actually assigned Gale his work.  (Richard Branham's Dep. 33–36.[2])  Gale was off duty during the weekend of June 19, 2004.  (David Gale's Log Sheet (June 19–20, 2004).[3])  On Monday, June 21, Gale delivered a load from Monroe, Ohio, to Valley City, Ohio.  On Tuesday, June 22, 2004, under direction from Everhart, Gale picked up a load of coiled steel from AK Steel's Zanesville, Ohio plant.  (Everhart's Dep. 54–55.)  He delivered the steel to Pridgeon & Clay, Inc., an automotive parts manufacturer in Grand Rapids, Michigan.  (*Id.*)  He arrived in Grand Rapids in mid-afternoon but did not complete delivery until approximately 10:00 p.m.  (Voicemail from David Gale to Everhart (June 22, 2004).[4])

While handling the delivery on June 22, Gale called Everhart five times to check in: he called Everhart at 8:19 a.m., 3:11 p.m., 3:27 p.m., 3:35 p.m., and 11:17 p.m. (David Gale's Phone Records.[5])  Between 3:00 p.m. and 5:00 p.m. Everhart arranged with Pittsburgh Logistics Company to have Gale pick up a load of coiled steel in East Chicago the

---

[1] Equipment Lease Agreement Between Independent Contractor and Carrier is Ex. D to Def.'s Br. (docket # 25).
[2] Richard Branham's Dep. is Ex. G to Def.'s Br. (docket # 25).
[3] David Gale's Log Sheet (June 19–20, 2004) is Ex. H-2 to Def.'s Br. (docket # 25).
[4] Voicemail from David Gale to Everhart (June 22, 2004) is Ex. 2 to Pl.'s Br. (docket # 23).
[5] David Gale's Phone Records are Ex. 8 to Pl.'s Br. (docket # 23).

next morning.⁶  (Email from Jack Allen, Pittsburgh Logistics, to Kent Everhart (June 22, 2004).)⁷  At 11:18 p.m. Gale left a message on Everhart's answering machine explaining that he had finished his delivery in Grand Rapids and was going to go find a place to sleep.  (Voicemail from David Gale.)  He also stated that he was going to head toward Chicago and that he didn't want his morning appointment to be made "real early."  (*Id.*)

After Gale left Pridgeon & Clay, he fell asleep at the wheel and collided with Emily Van Dyke's car, which was parked on the shoulder of I-196 outside of Holland, Michigan.  (David Gale's Written Statement.⁸)  Ms. Van Dyke had been stopped by a police deputy and was in her car at the time of the collision.  (Compl. Ex Rel. *Van Dyke v. Everhart Trucking, LLC.*⁹)  The impact propelled Ms. Van Dyke's car into a nearby ditch, where it caught on fire.  (*Id.*)  Ms. Van Dyke was pronounced dead at the scene.  (*Id.*)

The only disputed fact in this case is whether Gale was on "dispatch" at the time of the accident.  *Compare* (Tammy Branham's Dep. 12.¹⁰) (stating that the day after the accident Gale told her he was heading west from Grand Rapids at the time of the accident because Everhart had told him to pick up a load in East Chicago the next morning), *with*

---

⁶ Pittsburgh Logistics arranged much of Everhart's steel hauling, including a dedicated daily run from East Chicago to Turtle Creek, Pennsylvania.  Although it is disputed whether Gale was dispatched to pick up the East Chicago load, it is undisputed that Everhart and Pittsburgh Logistics intended to have Gale pick up the load.  It is also undisputed that Gale was positioning himself to be able to pick up the East Chicago load.

⁷ Email from Jack Allen, Pittsburgh Logistics, to Kent Everhart (June 22, 2004) is Ex. 9 to Pl.'s Br. (docket # 23).

⁸ David Gale's Written Statement is Ex. 4 to Pl.'s Br. (docket # 23).

⁹ Compl. Ex Rel. *Van Dyke v. Everhart Trucking, LLC* is Ex. A to Def.'s Br. (docket # 25).

¹⁰ Tammy Branham's Dep. is Ex. 14 to Pl.'s Br. (docket # 23).

(Kent Everhart's Dep. 20–35.[11]) (stating that Everhart never dispatched Gale to pick up the East Chicago load). At least part of this factual dispute implicates an underlying disagreement about the meaning of "dispatch" in the context of the insurance policies: in particular, whether "dispatch" requires a particular form of words or directive from Everhart to Gale, or whether it simply requires that Everhart and Gale had a common understanding that Gale was serving Everhart's business while traveling from Grand Rapids to East Chicago with the mutual expectation that Gale would pick up a load there the next morning. As the Court analyzes the policy language and applicable law, the disputed fact turns out to be immaterial.

## THE INSURANCE POLICIES

The Estate of Emily Van Dyke sued Everhart, R&T, and Gale for wrongful death, alleging three counts: (1) negligent operation of a motor vehicle; (2) owner liability; and (3) respondeat superior. (*Id.*) All of the defendants requested defense and coverage from their respective insurers. Redland refused to defend its insured. (Assignment of Claims.[12]) Auto-Owners defended all three defendants and eventually settled for the policy limits of one million dollars. (Settlement Documents 2.[13]) As part of the settlement, Auto-Owners obtained complete releases for all defendants. (*Id.* at 1.) Auto-Owners, as the subrogee and assignee of Everhart, R&T, and Gale, then brought this action seeking to recover from Redland (1) damages caused by Redland's alleged breach of the duty to defend,

---

[11] Kent Everhart's Dep. is Ex. 13 to Pl.'s Br. (docket # 23).
[12] Assignment of Claims is Ex. 11 to Pl.'s Br. (docket # 23).
[13] Settlement Documents are Ex. B to Def.'s Br. (docket # 25).

5

and (2) the one million dollar settlement, which Auto-Owners alleges is properly the obligation of Redland.

The Auto-Owners policy is a comprehensive liability policy. It provides insurance when a truck (1) for which Everhart has contracted for exclusive use (2) is used exclusively in Everhart's business (3) for the purpose of earning gross receipts. (Auto-Owners policy §§ I(i)(a), I(13).[14]) In addition, the Auto-Owners policy includes an endorsement, Form MCS-90, required by federal regulations for the protection of third-party accident victims. That endorsement requires Auto-Owners to provide coverage for claims like those asserted in the Van Dyke litigation, even if Auto-Owners later has recourse against another insurer. Auto-Owners recognizes and conceded at oral argument that its policy provides coverage if Redland's does not. The only real question before the Court, then, is whether the Redland policy also provides coverage.

The Redland policy is a type of insurance commonly known as bobtail insurance. It is intended to provide insurance when a covered truck is "bobtailing" or "deadheading."[15] It is not intended to apply when the truck is actually engaged in business operations. The Redland policy accomplishes this purpose through an endorsement, which provides:

---

[14] Auto-Owners policy is Ex. L to Def.'s Br. (docket #25).
[15] In the trucking industry, bobtailing means operating a tractor without a trailer, and deadheading means pulling an empty trailer. Bobtail coverage is intended to insure a truck that is bobtailing or deadheading, but more accurately it is intended to provide insurance coverage when a truck is being used for any nontrucking purpose.

>    **This insurance does not apply** to:
>
>    . . . .
>
>    2. A covered auto, or a temporary substitute, or any trailer attached to this auto when being maintained or used (i) **at the direction of, under the control of, under orders from, after being dispatched by, or in the business of any trucking company or lessee of such auto**, or (ii) under any permit, authority or operating rights granted by any governmental agency to operate as a common or contract carrier including your own permit, authority or rights.

(Nontrucking Use Endorsement.[16]) This case turns on the application of the language in this endorsement.

## ANALYSIS

*Choice of Law*

Initially, the parties disagree over what law the Court should apply in resolving the parties' motions. The question is largely academic since the application of either Ohio or Michigan substantive law results in the same outcome in this case. The only potential difference is in the law of damages. Michigan law would not permit recovery of punitive damages in an action like this one; Ohio law, in contrast, might. Accordingly, if Redland breached its duty to defend or to indemnify or both, then Auto-Owners could be entitled to punitive damages under Ohio law.

In deciding what law to apply, this Court looks to Michigan's choice-of-law rules. *See Mills' Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002) (stating that a federal court with diversity jurisdiction applies the choice-of-law rules of the forum state). When interpreting a contract, Michigan's choice-of-law rules direct a court to begin with the

---

[16] Nontrucking Use Endorsement is Ex. 6B to Pl.'s Br. (docket # 23).

presumption that the law of the place of contracting applies. *Chrysler Corp v. Skyline Indus. Servs. Inc.*, 528 N.W.2d 698 (1995). The rules then require a court to consider the factors enumerated in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971). *Id.* Those factors are the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile of the parties. *Id.*

In this case, the Court begins with the presumption that Ohio law—the law of the place of contracting—applies. While the Restatement provides that the place of performance is a factor to be considered, it is not the only factor, and in this case the other factors weigh heavily in support of applying Ohio law. Ohio has far more contacts to the policy than Michigan. The place of contracting and negotiation in this case was Ohio. The insured parties are Ohio citizens, and having been assigned the right to bring this action by Everhart, Gale, and R&T, Auto-Owners stands in the shoes of Ohio citizens. Because of the policy's extensive contacts with Ohio, Michigan's choice-of-law rules direct this Court to apply Ohio law in this case.

Auto-Owners argues that the parties could have anticipated performance of the contract in many states, including Michigan, and therefore Michigan law should apply, especially now that the only real parties in interest include a Michigan insurer. But there is no indication that that the parties intended to subject the same contract language to multiple, and possibly conflicting, interpretations based on differing state law. As explained above, performance is only one factor to be considered by the Court in a choice-of-law analysis, and

8

in this case it is outweighed by the other factors that the Court must consider. Moreover, application of Ohio law will ensure that the policy receives a uniform interpretation instead of an interpretation that differs from case to case depending on the place of performance. After all, Auto-Owners is suing in its capacity as subrogee and assignee of the underlying policyholders, all of whom are Ohio citizens, and all of whom have a reasonable interest in uniform construction of the policies that insure their Ohio business operations.

***Cross Motions for Summary Judgment***

   ***Coverage***

The pivotal issue in this case turns on the construction of the Redland policy's nontrucking endorsement. Redland's policy does not apply if at the time of the accident Gale was using the truck "at the direction of, under the control of, under orders from, after being dispatched by, or in the business of" Everhart. The resolution of the parties' cross motions for summary judgment therefore depends on whether at the time of the accident Gale was using the truck at the direction of, under the control of, under orders from, after being dispatched by, or in the business of Everhart.

Auto-Owners moves for summary judgment on the theory that the Redland endorsement applies only if, before the accident, Everhart specifically and expressly told Gale something to the effect of, "we are dispatching you to East Chicago to pick up a load tomorrow morning." Even assuming for purposes of argument that the endorsement is fairly construed that narrowly, Auto-Owners's motion must fail because there is evidence from which a reasonable fact finder could conclude that Everhart actually gave Gale such a

9

direction. Everhart denies using specific words of dispatch, but a reasonable fact finder could reject that assertion based on other credible evidence. For example, the day after the accident, Gale himself said that Everhart told him to pick up the load in East Chicago. That alone is enough to create a fact issue on the point and preclude summary judgment for Auto-Owners.

In addition, there is other evidence from which a reasonable fact finder could draw the inference that Everhart actually dispatched Gale to pick up the East Chicago load. Gale was off-duty in Ohio the weekend before he was dispatched to deliver the load to Grand Rapids. On Monday he handled a job in Ohio, and the next day he was dispatched to deliver a load to Grand Rapids, where he remained on business a long distance from his business and personal home. He was not heading from Grand Rapids toward Chicago on personal business. Instead, he was hoping to pick up a load in East Chicago. In fact, the East Chicago load was a regular one for Everhart, and Everhart was paid just to have a driver in the area whether or not there was actually a load to pick up. (Everhart's Dep. 13–14.) Moreover, both Everhart and Gale were operating with the understanding that Gale was going to be assigned the load as long as he had the required hours of rest. (*Id.* at 28–29; Branham's Dep. 7–8.) The voicemail from Gale to Everhart, in which Gale states that he will head toward Chicago and asks that his appointment the next morning not be made "real early," is strong evidence of Gale's belief that Everhart expected him to be in East Chicago the next morning. Thus, summary judgment for Auto-Owners on the coverage issue is not appropriate.

The question remains whether Redland is entitled to summary judgment despite the conflicting evidence of whether Everhart used words of dispatch when talking to Gale. The Court believes that Redland is entitled to summary judgment on the coverage issue because the plain language of the endorsement is not as narrow as Auto-Owners would like to construe it. The endorsement, by its terms, precludes coverage not only after a covered truck has been "dispatched by" or is "under orders from" Everhart, but also when the truck is "in the business of any trucking company or lessee" of the covered truck. The "in the business of" prong of the endorsement expands the scope of the exclusion. On the undisputed facts of this case, the Court concludes that a reasonable fact finder would have to conclude that Gale was operating "in the business of" Everhart at the time of the accident.

The "in the business of" language in Redland's policy is contract language, and its interpretation is therefore a matter of law. *See City of Sharonville v. American Employers Ins. Co.*, 846 N.E.2d 833, 836 (Ohio 2006) (holding that insurance policies are contracts interpreted according to contract-interpretation principles); *see also Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005) (same). In interpreting a contract, terms are given their ordinary meaning, and, in the case of insurance contracts, ambiguous provisions are strictly construed against the insurer. *City of Sharonville*, 846 N.E.2d at 836; *Rory*, 703 N.W.2d at 26. The Court is not aware of any case addressing the precise endorsement language at issue here, and counsel knew of none at oral argument. There are a number of cases addressing similar policies and similar language, but those cases all turn on their unique facts and policy

11

language. However, some patterns do emerge from the caselaw that are useful in interpreting the Redland policy.

In an oft-cited case, *St. Paul Fire & Marine Ins. Co. v. Frankart*, 370 N.E. 1058, 1062 (Ill. 1977), the Illinois Supreme Court established a bright-line test for application of "in the business of" language in a bobtail policy. The court found that the language in that policy meant that a truck is in the business of a lessee unless and until the truck (1) returns to the place where the haul originated, (2) returns to the terminal from which the haul was assigned, or (3) returns to the terminal from which the driver customarily is assigned hauls. The parties agreed at oral argument that under this test Redland is entitled to summary judgment. Many states follow *Frankart*, but neither Michigan nor Ohio has expressly adopted its bright-line test.

Other cases have applied a more flexible "commercial interests" test to hold that a driver is in the business of a lessee only when he is serving the lessee's commercial interests and not when he is free to pursue "leisurely engagement" "hither and yon," even if he has yet to return to one of the three destinations identified in *Frankart*. *Empire Fire & Marine Ins. Co. v. Brantley Trucking, Inc.*, 220 F.3d 679, 682 (5th Cir. 2000) (quoting *Liberty Mutual v. Conn. Indemnity Co.*, 55 F.3d 1333, 1337 (7th Cir. 1995); *Lime City Mut. Ins. Co. v. Mullins*, 615 N.E.2d 305, 307–08 (Ohio App. 1992)). Under this test, a driver is furthering a lessee's commercial interests when he is purposely heading toward a destination to pick up a load, knowing that he is expected at that destination, and knowing that timing is important. *Id.* Courts have also held that a driver was furthering a lessee's commercial

interests when the driver was on his way to find a place to sleep, stopped for lunch, or took a detour to pick up his dry-cleaning. *See, e.g.*, *Greenwell v. Boatwright*, 184 F.3d 490, 492 (6th Cir. 1999) (holding that a driver who was in an accident while on his way to a motel with the intent to rest for the night and continue his delivery in the morning was still in the business of the lessee, and stating in dicta that *Frankart* would seem to require such a holding even if the driver had already dropped off his load); *Planet Ins. Co. v. Anglo-American Ins. Co.*, 711 A.2d 299, (N.J. Super. Ct. App. Div. 1998) (holding that a driver who was in an accident on his way to pick up his dry-cleaning was still in the business of his employer because he was on his way from picking up the truck for repairs and the essential purpose of his trip was to benefit his employer by having the truck repaired).

None of these cases is necessarily controlling in this case because each of them interprets different contract language on different facts, but together they support the proposition that "in the business of" language in bobtail policies is generally intended to distinguish between those situations where a driver is operating in commerce and those where the driver is truly out of service and on personal time. With that general proposition in mind, and without attempting to articulate or apply a rule for all possible cases, this Court holds that the Redland policy's "in the business of" exclusion is unambiguous and that the evidence, even when viewed in the light most favorable to Auto-Owners, requires the conclusion that at the time of the accident Gale was operating "in the business of" Everhart. After having enjoyed a weekend off work, Gale was on business far from both his home and the home base of his employer. He had finished delivering one load and was positioning

13

himself to pick up another the next morning.  In fact, Everhart expected him to get rest so that he would be eligible to pick up a load the next morning.  Moreover, Gale's truck was under an exclusive lease to Everhart, which means that when Gale was on the road with the truck he could not further the business of anyone but Everhart.  At no point was Gale on a personal trip.  He never stopped serving the economic interests of Everhart: the essential purpose of Gale's actions was to benefit Everhart by getting the required hours of sleep and ensuring his ability to make a pick up the following morning.  Gale's actions in furtherance of Everhart's commercial interests fit within the ordinary meaning of the phrase "in the business of," and therefore the Redland policy did not apply at the time of the accident.  Redland is entitled to summary judgment on this issue.

Auto-Owners argues that Redland is not entitled to summary judgment because the "in the business of" language in bobtail policies is ambiguous and must be construed strictly against the insurer.  In support of this argument, Auto-Owners cites two Michigan cases holding that the "in the business of" language in certain bobtail policies was ambiguous and construed strictly against the insurer.  *Engle v. Zurich-American Ins. Group*, 549 N.W.2d 589 (Mich. Ct. App. 1996); *Zurich-American Ins. Co. v. Amerisure Ins. Co.*, 547 N.W.2d 52 (Mich. Ct. App. 1996).  In the first place, Michigan law does not apply so the cases do not articulate governing law.  Moreover, the cases are distinguishable.  The Michigan Court of Appeals did not hold that nontrucking endorsements using "in the business of" language are per se ambiguous and unenforceable.  Instead, it simply held that the policies before it were ambiguous as to whether a return trip was within the policies' meaning of "in the business

of."  The policies before the Michigan Court of Appeals contained different language than the Redland policy, and the court was applying that language to different facts.  Different facts and different language necessitate a different holding in this case.  As discussed above, the "in the business" language in the Redland policy is plain and unambiguous when applied to the facts here.  Accordingly, Redland is entitled to summary judgment on the coverage issue.

### *Duty to Defend*

When the Estate of Emily Van Dyke sued Gale, R&T, and Everhart, Redland not only denied coverage but also refused to defend its insured.  Auto-Owners ultimately defended and settled the case and obtained releases for all defendants.  Auto-Owners argues that it is entitled to reimbursement for its expenses in defending Redland's insured.  The issue that determines Auto-Owners's entitlement to reimbursement is whether Redland had a duty to defend R&T from the claims brought by Emily Van Dyke.  The duty to defend is broader than and independent of the coverage question addressed above.

The Redland policy provides that Redland has the "right and duty to defend" its insured against a suit seeking damages for bodily injury.  Even if the policy did not contain that language, Redland, like all insurers, is obligated to defend an action when a complaint alleges conduct that could arguably be covered by its policy.  *City of Sharonville v. American Employers Ins. Co.*, 846 N.E.2d 833, 837 (Ohio 2006); *Polkow v. Citizens Ins. Co. of America*, 476 N.W.2d 382, 384 (Mich. 1991).  An insurer has this duty even if the allegations are groundless, false, or fraudulent.  *City of Sharonville*, 846 N.E.2d at 837;

15

*Polkow*, 476 N.W.2d at 384.  Importantly, the duty to defend is not affected by the Court's disposition and the insurer's ultimate liability.  *City of Sharonville*, 846 N.E.2d at 837; *Polkow*, 476 N.W.2d at 384.  An insurer need not defend an action, however, when all the claims in the complaint "are clearly and indisputably outside of the contracted policy coverage."  *City of Sharonville*, 846 N.E.2d at 837; *accord Polkow*, 476 N.W.2d at 384.

In the underlying case brought by the Estate of Emily Van Dyke, Count I alleges Gale's negligence, Count II alleges ownership liability, and Count III alleges vicarious liability for Gale's negligence.  Specifically, Count I alleges that Gale's negligent operation of the truck resulted in the accident with Emily Van Dyke's car and was the proximate cause of her death; Count II alleges that the truck that Gale was driving was owned by R&T, Redland's insured, and that R&T was therefore liable under Michigan statutory law for all injuries caused by Gale's negligent operation of the truck; and Count III alleges that Gale was an employee of Everhart and that Everhart was therefore liable under the doctrine of respondeat superior for Gale's negligent operation of the truck.  These allegations, particularly those in Count II, clearly fall within the insurance provided by Redland: they are claims against the insured seeking damages for bodily injury caused by an accident and resulting from the ownership and use of a covered truck.  Even if Redland thought that it could successfully argue that there was no basis for coverage, it had the duty to defend until it could establish that argument.  It breached that duty, and its breach caused Auto-Owners to expend defense costs defending Redland's insured.  Auto-Owners is therefore entitled to summary judgment on the duty to defend issue.

This leaves only the issue of damages for trial.  The defense in the underlying case did not entail excessive expenditures—only about twenty thousand dollars.  Under Ohio law, however, punitive damages are also recoverable in an appropriate case.  *See generally Saberton v. Greenwald*, 66 N.E.2d 224 (Ohio 1946) (providing a useful summary of the availability of punitive damages under Ohio law).  This Court makes no determination now of whether this is an appropriate case.  The only issues that remain for trial are the damages issues related to Redland's breach of the duty to defend.

An appropriate order accompanies this opinion.


Dated:   November 15, 2007              /s/ Robert J. Jonker
                                        ROBERT J. JONKER
                                        UNITED STATES DISTRICT JUDGE